UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jesse Wolch,
*On behalf of himself and other similarly
situated individuals*,

       Plaintiff,

   v.

Xtratyme Technologies Inc. and Kyle
Ackerman,

       Defendants.

**CLASS ACTION COMPLAINT AND
DEMAND FOR A JURY TRIAL**

## INTRODUCTION

1.    This is an uncommonly straightforward case of an employer failing to pay overtime compensation to its front-line workers and then summarily terminating an employee who complained—a violation of state and federal law on both counts.

2.    The principal defendant in this case, Xtratyme Technologies Inc., employs dozens of workers. Their job is to use point-to-point wireless technology to connect homes and businesses in rural Minnesota to the backbone of the internet—the network of fiber optic cables that snake their way across the state and around the world. The job is physically challenging. Workers spend their days climbing towers and buildings making these vital connections.

3.    The wage-and-hour violation at the heart of this case is clear. Based on Xtratyme's own written policies, most workers were misclassified as either independent contractors or overtime-exempt employees. Both groups of workers put in considerable

amounts of overtime—often more than 50 hours a week. Xtratyme tracks overtime hours worked. But it almost never *pays* overtime compensation. Instead, overtime hours are placed in a "time bank." In theory, employees can use the hours stored in the time bank to take paid vacation. But in practice, employees accrued such a massive amount of vacation that there was no way they could use it. Either way, the time bank policy was illegal. Overtime must be paid, on a contemporaneous basis, at time and half the employees' regular rate of pay. Xtratyme's employees received, at best, straight-time pay on a non-contemporaneous basis. And at worst, they received no overtime compensation at all. Their overtime wages just sat there, locked away in a bank.

4.     Xtratyme also has no credible argument that its workers were properly classified as independent contractors or overtime-exempt white-collar employees. The economic reality of the work strongly demonstrates the existence of an employment relationship. The arguments in favor of any white-collar exemptions are even weaker. None of Xtratyme's front-line workers were paid a bona fide salary. None were engaged in non-manual or office work. And none had duties emblematic of genuine professional, executive, or administrative workers.

5.     The Plaintiff in this case, Jesse Wolch, was subjected to Xtratyme's illegal compensation plan along with everyone else at the company. By January 2021, he had accrued hundreds of hours of banked time—time that should have been paid out as overtime premiums. Wolch complained to his boss, Defendant Kyle Ackerman, the CEO of the company. Wolch explained, in writing, that Xtratyme's compensation plan violated state and federal wage-and-hour laws. Wolch wanted to resolve the problem without

litigation. He repeatedly suggested that the parties call an employment lawyer or the Department of Labor to get an opinion on the issue. Eventually, when Ackerman rejected that idea, Wolch called the Department of Labor himself. A day later, Ackerman fired Wolch.

6.      Wolch now brings this action to put a stop to Xtratyme's illegal compensation plan, to secure the overtime premiums owed to him and similarly situated individuals, and to seek redress for Defendants' unlawful retaliation.

<b><u>PARTIES</u></b>

7.      Plaintiff Jesse Wolch is a Minnesota resident who lives in the city of Bowlus, Minnesota.

8.      Defendant Xtratyme Technologies, Inc. is a Minnesota corporation with corporate headquarters at 45 Washington Avenue #102, Hutchinson, MN 55350.

9.      Defendant Kyle Ackerman is the owner and CEO of Xtratyme Technologies. Ackerman resides in Minnesota.

<b><u>JURISDICTION</u></b>

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

11.     This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because Plaintiff's state and federal claims are so related that they form part of the same case or controversy.

12.     Venue is proper in the United States District Court, District of Minnesota, pursuant to 28 U.S.C. § 1391, because Defendants reside and conduct business in this

District and because the unlawful practices described herein were committed in this District.

## **FACTUAL ALLEGATIONS**

13.     Defendant Xtratyme Technologies ("Xtratyme") is a company that provides internet access to homes and businesses in rural Minnesota. It employs point-to-point wireless technology to connect customers to the fiber optic network that forms the backbone of the internet. Defendant Kyle Ackerman is the owner and CEO of Xtratyme. Ackerman exercises total control over the operation of the business including hiring, firing, human resources, sales, procurement, and contracting.

14.     Xtratyme employs dozens of installation workers. These workers drive to various locations and install and configure the equipment necessary to bring wireless internet to Xtratyme's customers. The work is physical and often challenging. Workers frequently climb towers and buildings in the course of their duties. Xtratyme also employs tech support workers, network engineers, installation engineers, salespeople, and general laborers.

15.     Installers/employees also work long hours. They often worked 50 to 55 hours a week.

16.     Plaintiff Jesse Wolch was employed by Xtratyme from March 15, 2019 until February 2, 2021 as an installer. Wolch's principal duty was driving to various locations and then building and configuring internet connections for Xtratyme's customers.

17.     Before January 5, 2020, Wolch, like other employees, was paid straight time for all hours worked each week. No overtime premiums were paid.

18.     On January 5, 2020, Xtratyme changed its compensation plan. These changes were set forth in a memorandum, entitled "Employment Policy Changes," sent by Defendant Ackerman to all employees on January 5, 2020. A copy of this memorandum is attached as Exhibit A.

19.     The new policy first gave workers a choice to engage with Xtratyme either as independent contractors or employees. Under the policy, it was up to each employee to decide how he would be classified.

20.     If a worker chose to proceed as an employee, the policy required him to decide whether he would be classified as an hourly or salaried worker.

21.      Hourly workers were paid an hourly rate, with no overtime, regardless of the number of hours worked. Hourly workers were not allowed to work more than 86.67 hours in any given bi-monthly pay period without prior approval from a manager.

22.     Salaried workers were not actually paid a salary—at least in terms of how the law defines the concept. *See* 29 C.F.R. § 541.600. Here, too, the new policy required workers to make an election.

23.     Workers could choose to be classified as nonexempt—that is overtime eligible—"salaried" employees. But these employees were not paid a salary at all. The "salary" was derived by multiplying the employee's hourly rate of pay by 86.67 hours for each bi-monthly period. If any employee worked fewer than 86.67 hours in a given pay period, he was required to use "time off without pay" to compensate for these missing hours. Conversely, if the employee worked more than 86.67 hours in a pay period (a practice that was generally prohibited but could be approved by managers), that employee

would be paid time-and-a-half overtime on all hours worked in excess of 86.67 in that pay period. In other words, employees in this category only earned their "salary" if they worked *exactly* 86.67 hours per pay period. They earned less if they worked less, more if they worked more. The company also routinely deducted expenses from employees' "salaries." All told, this was a de facto hourly arrangement.

24.     Last, and most central to this case, the new policy permitted workers to elect to be classified as exempt—that is, overtime *ineligible*—salaried employees. The policy heavily encouraged workers to choose this route, telling workers, "[a]n exempt salaried employee…has the most advantages at our company." Because the company and its managers pushed for it, nearly all eligible employees chose this option.

25.     But here, too, the "salary" was an illusion. Workers classified as "exempt salaried" were paid an amount every pay period calculated by multiplying 86.67 hours by the worker's hourly rate. If a worker worked more than 86.67 hours in a pay period, this time was added to a "time bank." This time bank, according to the new policy, permitted workers to "bank [their] time so [they] can take paid time off (PTO) for any reason including vacations, sick, or personal time." So, for example, if an employee worked 100 hours in a pay period, he would be paid a "salary"—calculated by multiplying his hourly rate by 86.67 hours—and the additional 13.33 hours would be put in his time bank. And if, conversely, an employee worked only 70 hours in a bi-monthly pay period, he would still earn a salary, calculated by multiplying his hourly rate by 86.67 hours. But he would have 16.67 hours subtracted from his time bank. The company allowed the time bank balance to go negative, "within reason, if there is a chance that the balance will become positive

6

again." But in all other cases, workers were "required to take time off without pay." Here, too, the company routinely deducted expenses from employees' "salaries." This, too, was a de facto hourly arrangement.

26.     The policy purported to allow employees to use the time in their time bank to take paid leave. Such leave would be paid at a straight-time—not a time-and-a-half—rate. To illustrate, if any employee earning $25 an hour wanted to use eight hours from his time bank for a day off, he would be paid $200 ($25 an hour times 8 hours)—not $300 ($25 an hour times 8 hours times 1.5). In practice, though, the time stored in the time bank proved all but inaccessible. Requests for paid time off had to be approved by Xtratyme. Such requests were not uniformly granted. At the same time, employees racked up hundreds of hours of banked time—enough to take several months of paid time off under the policy. It became clear that employees would never be able to take paid leave in anything approaching that volume. And when employees left the company, all time in the time bank reverted back to the employer. In practice, the time bank was little more than an illusion for employees.

27.     Workers who elected to be classified as independent contractors were paid in the same manner as "exempt salaried" employees. They, too, were subject to the same time bank policy described in the previous paragraph.

28.     Plaintiff Jesse Wolch worked for Defendants as an installer. Under Defendants' new January 5, 2020 compensation policy, he was classified as a salaried exempt employee. By early 2021, he had accrued hundreds of hours in his time bank.

29.   Wolch's trouble began in January 2021 when he started contemplating using some of his banked time to take a vacation. Wolch became concerned that this time was not being paid out as time-and-a-half overtime compensation.

30.   Wolch inquired with Jen Schlueter, Xtratyme' human resources person, about the issue. But the conversation (which is in writing), quickly turned into a discussion of what the law required in terms of paying overtime. Wolch's position was clear. He wrote that "people working have to be paid according to law"—in this case, at a rate of 1.5 their regular rate for all overtime hours. Schlueter maintained that employees were not entitled to time-and-a-half overtime, citing company policy. Wolch responded by pointing out— correctly—that state and federal law trump company policy. He wrote: "[T]he policy reflected a thing that wasn't legit therefore voids the policy." Wolch also pointed out that he wasn't alone here. He wrote: "[E]veryone would love their money. It's not just a me thing. All the technicians and service people need to be back paid." Schlueter responded: "If somebody is classified wrong, we will work on getting it fixed." Wolch replied by saying that all he was after was for the company to "[p]ay according to FSLA. Easy peasy." Schlueter responded sarcastically, thanking Wolch for "spreading so much light on the situation" and "ruining my day yet again." She asked Wolch to give her the dates for his vacation. But Wolch said he could not do so until the company committed to paying out the vacation time at time and a half.

31.   Schlueter forwarded a transcript of her conversation with Wolch to Defendant Ackerman, Xtratyme' CEO, on January 27, 2021. She wrote: "Had a Skype discussion with Jesse [Wolch] to find out what his current plans for vacation are. Long

story short, he is not sure if he wants to use his vacation until he is guaranteed that he will get backpay at 1.5x and not single time as vacation since we will not buy him out on his vacation."

32.     Ackerman did not respond well. He wrote: "I really don't like the tone of this discussion." And, referring to Wolch, he said that "I've never had anyone argue so much about our policies in the 21 year history of our company. I sure wish this would change."

33.     The following day—January 28, 2021—Wolch was written up. The reason: his conversation with Schlueter supposedly showed a lack of respect. Schlueter wrote to Wolch: "[Y]ou continue to challenge or disregard company policy, have been uncooperative and some communications have been very disrespectful and ineffective. This leads to low morale, disruption, and reduced productivity. This must stop. This RD serves as a written warning."

34.     Wolch responded, pointing out that none of his communications were disrespectful. He simply drew attention, in a straightforward and respectful way, to the company's "mis-classification" of its workers.

35.     More retaliation followed. The next day, January 29, 2021, Wolch received a message from the president of Xtratyme, Jenni Luthens, asking him to call her. Wolch called her in the morning. During the 15-minute call, Luthens berated Wolch over his wage-and-hour complaints, repeatedly calling him "disrespectful," "selfish," "a bad person," and "an asshole." Wolch had never been called names like this before at Xtratyme. Luthens claimed that Wolch was conspiring with other employees to disrupt the company's service, but this wasn't true.

36.    Later that day, Wolch received a message from Schlueter, with both Ackerman and Luthens copied on the message. Schlueter listed (accurately) the Department of Labor's criteria for qualifying for the FLSA's executive exemption. She asked Wolch to "prove to me which" criteria were not satisfied. She then gave Wolch three options: (1) convert to an hourly, overtime-eligible employee; (2) continue as an overtime-ineligible exempt employee; or (3) "leave." She concluded by warning Wolch: "If you continue to violate our other rules and show disrespect to the owners, managers, and your colleagues at XTI, we will let you go."

37.    Wolch responded immediately to the group. He explained that he did not meet the criteria for the executive exemption. In his words, "I have respectfully answered your question with facts." Wolch told Schlueter and the others: "I am…growing tired of being threatened to be terminated for disrespect when no evidence of this."

38.    Wolch reminded Schlueter and the others that he had asked on prior occasions to be reclassified as an hourly, overtime-eligible employee, but was told "XTI couldn't afford to pay me hourly." He wrote that "I am just wanting to leave things as is until we are settled up with time. This means either I am correct and paid, or I am wrong and I move on to changing my status without back pay."

39.    On the merits of the overtime dispute and Xtratyme' retaliatory response, Wolch wrote:

> It's not a matter of opinion of treatment for me. I love my job. I do not love being called names and being threatened of termination for seeing and presenting facts. In fact it makes it look really bad when there is a poster you are supposed to have in your TC by law that states We as employees have the right make an FLSA investigation if we think there is wrong doing. The

threats of termination for defending my position when provoked with questions just isn't right. I have what I believe to be a legal argument on improper pay classification on the basis that the status cannot be offered, it must be qualified for and I simply do not qualify. A signature does not make it ok. this can be proven in the DOL file I sent Jen as nowhere in there does it say there is an exemption that you can sign for. All exemptions are on a qualification basis.

40.     Wolch then suggested a path forward, with the two sides calling the Department of Labor or a wage-and-hour attorney to get an opinion:

Perhaps maybe we can all get together and discuss this. we can call the DOL together and a lawyer and discuss it all together so we are all crystal clear? There just has to be a better way than going back and fourth [sic] here. It's a fairly cut and dry thing. Let's make a call together and just ask the questions we have to one that knows. I have already confirmed everything with a credible source and know the outcome but I am more than happy so sit in with you guys and make some calls. I want to help you resolve this, not make it messier.

41.     Ackerman replied to Wolch later that night (technically, now, on January 30, 2021, at 2:15 a.m.). Ackerman responded to Wolch's reasoned factual and legal analysis with more vitriol. He wrote: "This is where we have a serious problem with you Jesse. You just love to skew logic and bend it in ways that make no sense to the rest of us logical people." He continued: "You love to 'extract' and 'twist' literal things to mean what you 'think' they should mean." He concluded: "We have given you three choices and we are not going to debate this further. You need to choose one of them or we can't move on with a relationship. We are following the law, treating you fairly, and are prepared to prove this to other people if necessary. In the meantime, you need to determine your role and relationship with us and it needs to be done soon."

42.     Ackerman then explicitly threatened Wolch with termination if he continued to press the issue. Ackerman wrote:

> If you don't believe that we are following Minnesota law, you have all rights to contact the state, hire your own lawyer, or do whatever you feel is necessary. We will not, however, tolerate your "skewed" facts and context. If you want to pay an attorney to waste their time, go for it. We will not, however, work on this together. Our attorney will be prepared to show that everything we are doing with you is legit and legal. **If you want to challenge us in court or otherwise on this, you can do it as a non-employee.**

(Emphasis added.)

43.     Wolch wrote back to Ackerman at 7 a.m. Wolch wrote: "Respectfully speaking, you must meet ALL the bullet points. My labor is 99% manual and therefore disqualifies me right there. A title means nothing and it clearly states that in the dol document I provided."

44.     Ackerman wrote back at 11:45 a.m. He said: "This is untrue. Sorry, I gave you your options. Choose one and move on. If you don't choose one of the options we've offered by Monday, we will choose one for you."

45.     Ackerman then sent another message that threatened Wolch with retaliatory termination with even greater clarity. Ackerman wrote:

> I have a question for you.
>
> If you had started a company and you put your life savings into it and placed your employee well-being ahead of yours by treating them fairly, paying them a decent wage, etc.
>
> What would you do if an employee came to you and:
>
> 1. Lied about your concern for safety.
> 2. Accused you of cutting corners in reference to #1.
> 3. Twisted the truth many times.

4. Told other employees mistruths.

5. Threatened a lawsuit against you.

6. Disrespected you and your colleagues in many different ways.

Would you keep him as an employee or would you fire him?

46.    Two days later, on February 1, 2021, Wolch filed a complaint with the Department of Labor asking the Department to determine the lawfulness of Defendants' compensation plan. The same day, Wolch wrote to Ackerman, writing: "I have decided going forward to be [a] non-exempt" employee.

47.    One day after that, Ackerman fired Wolch. On February 3, 2021, Wolch woke up, looked at his phone, and saw a text message saying he'd been fired. He then checked his email and saw a message from Ackerman, sent late on February 2, formally terminating him. The email is attached to this complaint as Exhibit B. In the section of the email addressing the reasons for Wolch's termination, Ackerman wrote:

> * "You decided that you didn't like our salary-exempt program and you felt that the 'rules' needed to change for you so that you could be paid overtime instead of utilizing our time bank bonus program that you had accepted."

> * "You actively tried to 'pollute' the mental well-being of the rest of the team when it came to their acceptance of our time bank bonus program. You tried to convince several of our employees that we were treating them illegally and that they too should join your 'cause'. We spent hours and a lot of money correcting the damage that you caused. Some of it is still causing problems for us."

> * "You reported us to the DoL for our illegal employment practices. While you have the right to do this, we clearly showed you that we were following the employment laws."

## COLLECTIVE ACTION ALLEGATIONS

48.    Plaintiff brings Count One on behalf of himself and all individuals similarly situated.[1] The proposed FLSA Collective is defined as:

> All current or former installers, technical support workers, programmers, network engineers, installation engineers, and general laborers engaged by Defendants at any time beginning three years prior to filing this Complaint.

49.    Defendants have willfully engaged in a pattern of violating the FLSA by failing to pay members of the proposed FLSA Collective one and a half times their regular rate of pay for all hours worked in excess of forty in a workweek.

50.    Defendants' conduct constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255.

51.    Defendants are liable under the FLSA for failing to properly compensate Plaintiff and others similarly situated, and, as such, notice should be sent to the proposed FLSA Collective. There are numerous similarly situated current and former employees of Defendants who have suffered from the common unlawful policies and practices and who would benefit from the issuance of a Court-supervised notice of the present lawsuit and the opportunity to join the suit. Those similarly situated employees are known to Defendants and are readily identifiable through Defendants' payroll and timekeeping records. These similarly situated employees are interested in joining this action.

---

[1] Plaintiff's consent form is attached as Exhibit C. The consent forms of two opt-in plaintiffs are attached as Exhibits D and E.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings Counts Two and Three of this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed Minnesota Rule 23 Class is defined as:

> All current or former installers, technical support workers, programmers, network engineers, installation engineers, and general laborers engaged by Defendants at any time beginning three years prior to filing this Complaint.

53.     The persons in the proposed Rule 23 Class are so numerous that joinder of all of the proposed Rule 23 Class members is impracticable. While the precise number of class members has not been determined at this time, upon information and belief, Defendant has employed at least 40 installers, technical support workers, programmers, network engineers, installation engineers, and general laborers in Minnesota during the applicable limitations period. Plaintiff and the proposed Rule 23 Class have been similarly affected by Defendants' unlawful practices and policies.

54.     There are questions of law and fact common to the proposed Rule 23 Class that predominate over any questions solely affecting individual members of the proposed Rule 23 Class, including but not limited to:

> a.      whether Defendants violated Minn. Stat. § 177.25 (and accompanying regulations) by failing to pay employees an overtime premium of one-and-one-half times their regular hourly rate for hours worked in excess of forty-eight in a workweek;
>
> b.      whether Defendants misclassified their employees by treating them as exempt from the overtime requirement of the MFLSA;
>
> c.      the proper measure of compensatory damages, liquidated damages, and civil penalties; and

d.     whether Defendants should be enjoined from such violations in the future.

55.     Plaintiff's claims are typical of those of the proposed Rule 23 Class. Plaintiff, like other members of the proposed Rule 23 Class, was subjected to Defendants' unlawful policies and practices, resulting in a violation of the MFLSA. Members of the proposed Rule 23 Class have sustained similar injuries as a result of Defendants' actions.

56.     Plaintiff will fairly and adequately protect the interests of the Rule 23 Class. He has retained counsel experienced in complex wage and hour class action litigation.

57.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

58.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

59.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law or fact predominate over any questions affecting individual class members, and a class action is superior to other methods in order to ensure a fair and efficient adjudication of this controversy. In the context of wage and hour litigation, individual plaintiffs lack the financial resources to vigorously prosecute separate lawsuits against large defendants. Class litigation is also superior because it will preclude the need for unduly duplicative litigation resulting in inconsistent judgments pertaining to

Defendants' policies and practices. There do not appear to be any difficulties in managing this class action.

60.     Plaintiff intends to send notice to the proposed Rule 23 Class to the extent required by Fed. R. Civ. P. 23(b)(3).

## CAUSES OF ACTION

61.     Wolch was right about the law. Defendants' compensation plan is facially unlawful under federal and state law. And, of course, it is illegal in any event to terminate an employee in retaliation for opposing a practice he believes in good faith is unlawful.

## COUNT I—FLSA FAILURE TO PAY OVERTIME
### (FLSA, 29 U.S.C. § 207; On behalf of Plaintiff and the FLSA Collective)

62.     The FLSA requires that "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Defendants' employees are engaged in commerce. Defendants are also an enterprise engaged in commerce.

63.     Compliance with the FLSA is straightforward. For all nonexempt employees, overtime must be paid at one-and-a-half time the employee's regular rate. For example, an employee who earns $20 an hour must earn $30 an hour on all hours worked over 40 in a given workweek.

64.     Before January 5, 2020, Defendants simply paid the straight time hourly rate for all hours worked each week. This violated the FLSA. All hours worked in excess of 40 per week must be paid at 1.5 times the employee's regular rate. 29 U.S.C. § 207(a)(1). Defendants failed to do this.

65.     Defendants' time bank policy, implemented on January 5, 2020, violated the FLSA's strictures in several ways. *First*, the policy does not even purport to pay employees at their time-and-a-half rate. As before, it pays, at best, straight time. An employee who manages to secure some paid time off earns only his regular rate for every hour of paid leave.

66.     *Second*, the time bank policy actually pays *less than* straight time; that is because the amount in the time bank *goes down* if employees fail to work a full-time schedule in a given pay period. This is a classic example of averaging workweeks to minimize overtime. An employee who works 45 hours in one week and 35 hours the next is entitled to 5 hours of overtime pay—the two weeks cannot be averaged to minimize (or cancel out) the overtime already earned. The governing regulations make this clear: "If in any workweek an employee is covered by the Act and is not exempt from its overtime pay requirements, the employer must total all the hours worked by the employee for him in that workweek … , and pay overtime compensation for each hour worked in excess of the maximum hours applicable under section 7(a) of the Act." 29 C.F.R. § 778.103. Moreover, "[t]he Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks. Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the

applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40." *Id.* § 778.104.

67.    Defendants' compensation plan also violates the FLSA in another way. Employees only earn time in their time banks for hours worked exceeding 86.67 hours in any given *bi-monthly pay period*. But recall that the FLSA requires premium pay for all hours worked over 40 in *each workweek*. By averaging employees' total hours across bi-monthly periods, Defendants further minimized the amount of overtime premiums deposited in employees' time banks.

68.    *Third*, Defendants' time bank policy is illegal because it fails to pay overtime on a regular and contemporaneous basis. The governing regulations speak directly to this point as well:

> The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

*Id.* § 778.106. Here, of course, not only was the required overtime compensation not paid at employees' regular pay day, it typically was not *paid at all*. Employees had to gain approval from management before they could use their banked time. And many employees, Wolch included, had accrued such a ludicrous number of banked hours that they would

have needed to take months of vacation in to receive even a portion of the overtime compensation owed to them.

69.     Of course, as Defendants' pointed out in their correspondence with Wolch, employers need not pay overtime at all to employees deemed exempt by the FLSA or to nonemployees (like bona fide independent contractors). But Wolch was right here as well. Under the unambiguous terms of Defendants' own compensation plan, no employee was exempt. And any attempt to characterize the company's workers as independent contractors was also a misclassification.

70.     Start with the FLSA's exemptions. The FLSA contains dozens of exemptions to the FLSA's minimum wage and overtime rules. *See* 29 U.S.C. § 213. The burden of proof to demonstrate an exemption applies falls on the employer—not the employees. *Grage v. Northern States Power Co.-Minnesota*, 813 F.3d 1051, 1054 (8th Cir. 2015). Most FLSA exemptions have no plausible application here. *Id.* § 213(a)(10) (switchboard operators); (a)(12) (seamen); (a)(16) (criminal investigators). Like most employers, Defendants here focus on the exemption for employees "employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1).

71.     These so-called white-collar exemptions all share one key requirement: the employees must be paid a bona fide salary. The executive, professional, and administrative exemptions all require that an exempt employee must be "[c]ompensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week." 29 C.F.R. § 541.100 (executives); *id.* § 541.200 (administrators); *id.* § 541.300 (professionals). "An employee will be considered to be paid on a 'salary basis' within the meaning of [the regulations] if

the employee regularly receives each pay period … a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." *Id.* § 541.602.

72.     Defendants' compensation plan does not pay workers on a "salary basis" as the regulations define the concept. The arrangement is effectively hourly. All hours worked above 86.67 in any given bi-monthly pay period result in an hour-by-hour addition to an employee's time bank. And, more critically, if workers work *fewer* than 86.67 hours per bi-monthly pay period, they are, per the policy, "required to take time off without pay." In other words, their "salary" is reduced to reflect the lower number of hours worked. Defendants make other deductions from workers' "salaries" too. Because their bi-monthly pay is "subject to reduction because of variations in the quality or quantity of the work performed," *id.*, Defendants' employees are not compensated on a bona fide salary basis. They are therefore categorically ineligible for the FLSA's executive, administrative, and professional exemptions.

73.     Nor does Wolch—or any of Defendants' other installers—satisfy any of the other criteria necessary to qualify for the executive exemption. Wolch was an experienced installer. That meant he would, at times, direct the work of more junior installers in the field. He was, in essence, a crew lead. But these duties did not make him a bona fide executive. For starters, Wolch's primary duty was completing installations—not supervising employees. Wolch estimates that he spent 99 percent of his working time preparing for and completing his installation duties. "The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination

21

of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." *Id.* § 541.700(b). Under either rubric, Wolch was no executive. The central character of his work was performing installations. And he engaged in this work 99 percent of the time. Wolch also had no authority to hire and fire. *Id.* § 541.100(a)(4). And he only on one occasion recommended a friend for hire. This occurred after Wolch had been working for Defendants for roughly one month. His recommendation was given no more weight than any other employee.

74.     Any argument that Defendants' workers were properly classified as independent contractors is even weaker. Under the FLSA, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947). "To determine whether an individual is an employee under the FLSA, the Eighth Circuit uses the "economic realities" test. *Roeder v. Directv, Inc.*, No. C14-4091, 2017 WL 151401, at *9 (N.D. Iowa Jan. 13, 2017) (citing *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 961 (8th Cir. 2015)). The economic realities test examines the following six factors:

> (1) the degree of control exercised by the employer over the worker;
>
> (2) the worker's opportunity for profit or loss;
>
> (3) the worker's investment in the business;
>
> (4) the degree of skill and independent initiative required to perform the work;
>
> (5) the permanence or duration of the working relationship; and

(6) the extent to which the work is an integral part of the employer's business.

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947); *Putman v. Galaxy 1 Mktg., Inc.*, 276 F.R.D. 264, 274 (S.D. Iowa 2011). "No one factor is controlling and the court must base its decision on the totality of the circumstances." *Roeder*, 2017 WL 151401, at *9 (citing *Rutherford Food*, 331 U.S. at 728). None of these factors favors an independent contractor classification. By every metric, installers and other similarly situated workers were employed by Defendants.

75.    Two additional points bear mentioning. First, the statutory right to overtime cannot be waived by private agreement. *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975). Therefore, Defendants' decision to permit employees to choose between being classified as exempt employees, nonexempt employees, or independent contractors is of no moment. Employers have a statutory duty to classify their workers properly based on their duties and manner of pay.

76.    Second, the FLSA contemplates liability against not only the corporation owing the overtime compensation but also the individual corporate officers: "[A] corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *See, e.g.*, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)). Defendant Ackerman exerted operational control over Defendant Xtratyme. He is therefore liable for the FLSA violations described in this complaint.

## COUNT II—MFLSA OVERTIME
**(MFLSA, Minn. Stat. § 177.21, *et seq.*; On behalf of Plaintiff and the Rule 23 Class)**

77.     For much the same reasons, Defendants' compensation practices violate the Minnesota Fair Labor Standards Act ("MFLSA,) Minn. Stat. § 177.21, *et seq.*

78.     Plaintiff and the proposed Minnesota Rule 23 Class are or were employees of Defendants within the meaning of the MFLSA, Minn. Stat. §§ 177.23 and 177.24.

79.     Defendants were or are the employers of Plaintiff and the proposed Minnesota Rule 23 Class within the meaning of the MFLSA, Minn. Stat. §§ 177.23 and 177.24.

80.     The MFLSA requires employers to pay their employees for hours worked in excess of forty-eight in an individual work week at a rate not less than one and one-half times their regular hourly rate of pay. Minn. Stat. § 177.25, subd. 1. Defendants did not do so.

81.     Defendants knew or showed reckless disregard for the fact that they failed to pay their employees proper overtime compensation in willful violation of the MFLSA. Minn. Stat. § 541.07(5).

82.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Minnesota Rule 23 Class have suffered damages in an amount to be determined at trial.

### COUNT III—Failure to Keep Time and Wage Records
### (Minn. Stat. § 181.032 and Minn. Stat. § 177.30; On behalf of Plaintiff and the Rule 23 Class)

65.     Minnesota law, Minn. Stat § 181.032, requires employers to "provide each employee an earnings statement, either in writing or by electronic means, covering that pay period," that includes all the information specified in this provision, such as the employee's name, the total gross pay earned during the pay period, a list of deductions, etc.

66.     Minn. Stat. § 177.30 requires an employer to make and keep a record of employees' time and earnings, and notice provided to its employees of all personnel policies.

67.     Defendants have violated Minn. Stat 181.032 and Minn. Stat. § 177.30  by failing to keep accurate time and wage records.

68.     Defendants' actions in failing to maintain these records were willful.

70.     Plaintiff and the members of the proposed class are entitled to recover civil penalties, due to them pursuant Minn. Stat. § 181.171, subd. 1, and Minn. Stat. §§ 177.30(c), 177.27, subd. 8.

### COUNT IV—FLSA RETALIATION
### (FLSA, 29 U.S.C. § 215; On behalf of Plaintiff)

83.     Defendants violated the law in another way as well. They discharged Wolch because he raised questions about the legality of their pay practices. This conduct violated the FLSA's anti-retaliation provision.

84.     At all relevant times, Plaintiff was an employee of Defendants within the meaning of 29 U.S.C. § 203(e)(1).

85.     At all relevant times, Defendants were employers of Plaintiff within the meaning of 29 U.S.C. § 203(d).

86.     The FLSA, 29 U.S.C. § 215(a)(3), makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . related to this chapter."

87.     Plaintiff filed a complaint under the FLSA by asserting his right to the FLSA's employment protections (including payment of proper overtime) to his employer and to the DOL.

88.     Defendants discharged Plaintiff immediately after Plaintiff engaged in this statutorily protected activity.

89.     A causal connection exists between Plaintiff's statutorily protected activity and discharge.

90.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages in an amount to be determined at trial.

### COUNT V—VIOLATION OF MN WHISTLEBLOWER ACT
**(Minnesota Whistleblower Act, Minn. Stat. § 181.931, *et seq.*; On behalf of Plaintiff)**

91.     At all relevant times, Plaintiff was an "employee" under Minn. Stat. § 181.931, subd. 2.

92.     At all relevant times, Defendants were "employer[s]" under Minn. Stat. § 181.931, subd. 3.

93.     The Minnesota Whistleblower Act provides that an employer shall not discharge an employee because "the employee…in good faith, reports a violation [or a]

suspected violation…of any federal or state law…to an employer or to any governmental body." Minn. Stat. § 181.932, subd. 1(1).

94.     Plaintiff in good faith reported Defendants' violations of the FLSA and Minnesota state law to his employer and to the DOL.

95.     As described in the Complaint, Defendants discharged Plaintiff because he reported the above-mentioned violations of state and federal law to his employer and the DOL.

96.     Defendants' actions violated Minn. Stat. § 181.932, subd. 1(1).

97.     As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

### COUNT VI—VIOLATION OF MN WAGE THEFT PREVENTION ACT
**(Minnesota Wage Theft Prevention Act, Minn. Stat. § 181.101; On behalf of Plaintiff)**

98.     At all relevant times, Plaintiff was an "employee" under Minn. Stat. § 181.103, subd. 6.

99.     At all relevant times, Defendants were "employer[s]" under Minn. Stat. § 181.103, subd. 6.

100.    The Minnesota Wage Theft Prevention Act provides that "[a]n employer must not retaliate against an employee for asserting rights or remedies under this section, [or] sections 177.21 to 177.44 [the MNFLSA]…including, but not limited to, filing a complaint with the department or telling the employer of the employee's intention to file a complaint." Minn. Stat. § 181.103, subd. 6.

101.    Plaintiff in good faith reported Defendants' violations of the FLSA and Minnesota state law to his employer and to the DOL.

102.    As described in the Complaint, Defendants discharged Plaintiff because he reported the above-mentioned violations of state and federal law to his employer and the DOL.

103.    Defendants' actions violated Minn. Stat. § 181.103, subd. 6.

104.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a.    An order authorizing the sending of appropriate notice to current and former employees of Defendants who are potential members of the collective action under the FLSA, giving them the opportunity to opt into this action;

b.    A declaratory judgment that Defendants have willfully and in bad faith violated the overtime provisions of the FLSA and the MFLSA, and have deprived Plaintiff and the members of the class of their rights to such compensation;

c.    A declaratory judgment that the plaintiff and class members are employees, not independent contractors, under both the FLSA and Minnesota state law;

d.    Certification of a class pursuant to Fed. R. Civ. P. 23;

e.    An award of monetary damages to Plaintiff and members of the class and collective in the form of back pay for unpaid overtime wages, together with liquidated damages in an equal amount under the FLSA and Minnesota Fair Labor Standards Act;

f.      An award of damages for all wages that are due to Plaintiff and members of the class because of their misclassification and failure to receive all wages due;

g.      An award of civil penalties for all violations of the Minnesota law alleged herein;

h.      An award of prejudgment interest;

i.      Punitive damages;

j.      Attorneys' fees and costs; and

k.      Such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  May 12, 2021                    s/ Adam W. Hansen
                                        Adam W. Hansen (#0391704)
                                        APOLLO LAW LLC
                                        333 Washington Avenue North, Suite 300
                                        Minneapolis, MN 55401
                                        Telephone: 612.927.2969
                                        adam@apollo-law.com

                                        *Attorney for Plaintiff and the Proposed Class*